**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **EDWIN JONES,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.: 2:16-cv-01121-RDP** |
| } | |
| **CITY OF BIRMINGHAM,** } | |
| } | |
| **Defendant.** } | |

**MEMORANDUM OPINION**

This case is before the court on Defendant's Motion for Summary Judgment (Doc. # 16) and Defendant's Motion to Strike (Doc. # 20). The parties have fully briefed the motions (*see* Docs. # 17, 19-21, 23), and they are under submission. The court held oral argument on these motions on May 29, 2018. After careful review, and for the reasons explained below, the court concludes that the Motion for Summary Judgment is due to be granted in part and denied in part. The Motion to Strike is due to be denied as moot.

## I. Motion to Strike

Defendant asks the court to strike two exhibits filed with Plaintiff's opposition to the summary judgment motion. (Doc. # 20). The court has reviewed the exhibits and finds that the statements provided in them are mostly duplicative of Plaintiff's testimony. The court does not require any evidence provided in the exhibits to rule on the issues presented in the pending summary judgment motion and chooses to not consider the challenged exhibits for purposes of deciding this motion.[1] Therefore, Defendant's Motion to Strike (Doc. # 20) is due to be denied

---

[1] This ruling only concerns the evidentiary value of the exhibits at the summary judgment stage. It is not intended to preclude any party from introducing the exhibits at trial or challenging their admission.

as moot. *See Porterfield v. Flowers Baking Co. of Opelika, L.L.C.*, No. 2:05-CV-937-MEF, 2007 WL 4373006, at *9 (M.D. Ala. Dec. 12, 2007) (denying motion to strike paragraph of an affidavit as moot because the court found the testimony unhelpful and chose not to consider it).

## II. Factual Background[2]

In 2014, the City of Birmingham Police Department ("Police Department") hired Plaintiff, a black male, as a police officer. (Jones Deposition at 23, 26-27).[3] Plaintiff initially worked as a patrol officer for eight weeks, and the Police Department then transferred him to the West Precinct Task Force ("Task Force"). (*Id.* at 23-24, 95-96). Plaintiff worked on the day shift (8:00 a.m. to 5:00 p.m.) while assigned to the Task Force. (*Id.* at 96).

On March 2, 2015, Plaintiff bent down to converse with another officer who was sitting at a desk. (*Id.* at 26). Officer Nathan Duclos, a white male, positioned himself behind Plaintiff and made grinding sounds and pelvic thrusts. (*Id.* at 27-28). Plaintiff responded by telling Duclos, "I don't play that gay stuff, don't do me like that." (*Id.* at 28). Duclos laughed at Plaintiff's reaction. (*Id.* at 29). Plaintiff then told him, "you think it's funny but it ain't funny with me." (*Id.*).

Lieutenant Julie Quigley-Vining overheard the interaction between Plaintiff and Duclos from her office.[4] (Quigley-Vining Deposition at 25-26).[5] Quigley-Vining did not observe

---

[2] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[3] Plaintiff's deposition transcript, hereinafter referred to as the "Jones Deposition", is located in Document # 17-1. This memorandum opinion cites Plaintiff's deposition testimony by reference to the minuscript pages. It cites exhibits to the deposition by reference to the electronically-generated CM/ECF page numbers.

[4] The parties dispute the tone with which Plaintiff responded to Duclos. Defendant, relying on Quigley-Vining's testimony, states that Plaintiff responded loudly. (Doc. # 17 at 4) (citing Quigley-Vining Deposition at 25). Plaintiff responds that he confronted Duclos in a normal tone of voice. (Doc. # 19 at 2) (citing Jones Deposition at

Duclos's actions, and Duclos was no longer present by the time Quigley-Vining left her office. (*Id.* at 26). Plaintiff has testified that Quigley-Vining yelled at him and ordered him to come to her office. (Jones Deposition at 29-30). According to Plaintiff, Quigley-Vining discussed Plaintiff's comment with him and explained that Plaintiff had disrespected her family and her. (*Id.* at 30). Quigley-Vining also told Plaintiff that she could not "stand you people" and spit on his face. (*Id.* at 30-31). Plaintiff recalls Quigley-Vining using profanity during the exchange. (*Id.* at 31). Ultimately, though, Quigley-Vining did not discipline Plaintiff for his conduct that day. (*See* Quigley-Vining Deposition at 41).

On March 3, 2015, Plaintiff submitted a written complaint to Lieutenant Mike Acton regarding Quigley-Vining's conduct. (Jones Deposition at 36-37). Although the written complaint discussed Duclos's conduct, Plaintiff only complained about Quigley-Vining's actions. (*See* Doc. # 17-1 at 50). Acton told Plaintiff that a captain needed to handle the investigation. (Jones Deposition at 37-38). The Police Department's internal affairs department handled the investigation, during which they questioned Quigley-Vining. (Quigley-Vining Deposition at 38).

On June 27, 2015, while the investigation into the March 2015 complaint was ongoing, Plaintiff addressed two sergeants who were speaking with each other. (Jones Deposition at 39-40). He recalls that Quigley-Vining turned her back to him and was conversing on her cell phone when he approached the other officers. (*Id.* at 39, 41). When Plaintiff clocked in for an overtime shift, Quigley-Vining confronted him for not respecting her. (*Id.* at 40-41) (discussing

---

28). During his deposition, Plaintiff did not specify the tone he used to respond to Duclos's conduct. (Jones Deposition at 28). Nevertheless, the court adopts his version of the disputed events. This factual dispute is not material to the Title VII claims at issue.

[5] Quigley-Vining's deposition transcript, hereinafter referred to as the "Quigley-Vining Deposition", is located in Document # 17-2. This memorandum opinion cites her deposition testimony by reference to the minuscript pages. It cites exhibits to her deposition by reference to the electronically-generated CM/ECF page numbers.

allegations in the Complaint). Plaintiff did not respond to her because Police Department personnel gave him an order to not have direct contact with Quigley-Vining. (*Id.* at 41-42). Plaintiff began writing down information, and Quigley-Vining angrily told him that she did not care what he wrote down. (*Id.* at 42). Finally, Quigley-Vining warned Plaintiff that she would write him up if he acted similarly again. (*Id.*). According to Plaintiff, she yelled, "[y]ou can take this as your verbal warning. The next time I will write you up." (*Id.* at 44). (*See also* Doc. # 17-1 at 54).

Plaintiff reported this confrontation to Sergeant Timothy McCord. (Jones Deposition at 42). McCord advised Plaintiff to report the confrontation to his supervisor. (*Id.* at 43). Plaintiff complained to Police Department personnel that Quigley-Vining did not threaten white officers with discipline for disrespecting her. (*Id.* at 44-45). On June 29, 2015, Plaintiff submitted his written complaint against Quigley-Vining to Captain James Blanton. (Doc. # 17-1 at 54).

That same day, Quigley-Vining issued Plaintiff a letter of counseling for his conduct and deportment during the June 27th incident discussed above. (Doc. # 17-1 at 55). According to Plaintiff, Quigley-Vining approached him as he left the precinct building and handed him the letter. (Jones Deposition at 46). She reminded him of her verbal warning. (*Id.*). Plaintiff refused to sign the counseling letter. (*Id.* at 47). Quigley-Vining documented that Plaintiff had refused to sign the counseling letter. (Doc. # 17-1 at 55). On June 30, 2015, Plaintiff submitted a written complaint to Blanton about Quigley-Vining's counseling letter. (*Id.* at 56).

On July 7, 2015, Police Department Chief A.C. Roper reprimanded Plaintiff for the March 2015 incident. (Doc. # 17-1 at 52-53). Roper reprimanded Plaintiff for his lack of courtesy, poor manner, unkind remarks, harassment, and use of coarse language. (*Id.*). To justify the reprimand, Roper recounted Plaintiff's statement to Duclos and an additional

statement that he did not "believe in gay marriage." (*Id.* at 53). Roper explained that several officers heard the statements and that Plaintiff failed to "consider[ ] the diversity of [his] fellow employees." (*Id.*). That same day, Roper also reprimanded Quigley-Vining for the March 2015 incident. (Doc. # 17-2 at 34-35). He wrote that Quigley-Vining had lost her temper, "berated [Plaintiff] within earshot of several other officers and a trustee," and "unnecessarily brought your domestic situation into the matter." (*Id.*).

On July 30, 2015, Plaintiff submitted a discrimination charge to the Equal Employment Opportunity Commission ("EEOC"). (Doc. # 17-1 at 47-48). His EEOC charge discussed the March 2015 encounter, Quigley-Vining's verbal warning to him on June 27, 2015, and the June 29, 2015 written reprimand. (*See id.*). Within a few days of Plaintiff's EEOC charge, the Police Department transferred Quigley-Vining to a different precinct. (Quigley-Vining Deposition at 56-57; Jones Deposition at 49).

Plaintiff has testified that, on August 10, 2015, Sergeant Carl Walker asked him whether he had filed an EEOC complaint. (Jones Deposition at 56-57). At that time, Walker was Plaintiff's direct supervisor. (*Id.* at 57-58). Plaintiff told Walker that he had filed an EEOC complaint. (*Id.* at 57). Walker has confirmed that he discussed the EEOC complaint with Plaintiff, but explains that he did so to dissuade Plaintiff from discussing his business with others in the office. (Doc. # 17-3 at 47-48).

On August 18, 2015, the Police Department reassigned Plaintiff from the Task Force to a patrol unit. (Doc. # 17-4 at 1). Plaintiff asked Acton about the transfer. (Jones Transcript at 63). Acton told him that he was being transferred because Walker did not like him and did not want him on the Task Force. (*Id.* at 63-64). According to Plaintiff, Acton then asked him whether he had filed an EEOC complaint, and Plaintiff affirmed that he had done so. (*Id.* at 64).

Plaintiff testified that he was scheduled to work an overnight shift (11:00 p.m. to 7:00 a.m.) after being placed on the patrol unit. (*Id.* at 72). He did not receive weekends off while working on that unit, but had weekends off while assigned to the Task Force. (*Id.* at 71). Plaintiff was assigned to answer more calls, such as domestic disturbances, while working for the patrol unit. (*Id.* at 67). When he worked for the Task Force, his responsibilities primarily concerned burglary calls and stopping cars to check individuals for warrants. (*Id.* at 66-67).

While Plaintiff worked for the Task Force, he was able to sign up for overtime work after his shift ended at 5:00 p.m. (*Id.* at 70-71). Conversely, Plaintiff could sign up for evening overtime shifts while he worked on the Task Force. (*Id.* at 77). After his transfer to the patrol unit, Plaintiff attempted to sign up for overtime, but he was unable to do so, even though he observed open overtime shifts. (*Id.* at 74-76). Plaintiff asked Sergeant Pier Walker (*i.e.*, a different officer than Sergeant Carl Walker) why he could not sign up for overtime shifts at the Crossplex in Birmingham. (*Id.* at 77-78). Carl Walker was responsible for coordinating security at the Crossplex. (Doc. # 17-3 at 69-70). Plaintiff explained that Pier Walker tried to sign him up for overtime at the Crossplex, but she could not get him approved for overtime. (Jones Deposition at 79). According to Plaintiff, Pier Walker confronted Carl Walker, and Carl said that Plaintiff would not work at the Crossplex "as long as I'm over it." (*Id.*).

On January 6, 2016, Plaintiff submitted a second charge to the EEOC, this one complaining of retaliation he claims to have suffered for filing his earlier EEOC charge. (Doc. # 17-4). Plaintiff asserted in his second charge that he had been moved from the Task Force to a patrol unit, and that he had been denied opportunities for "side jobs." (*Id.*). On January 18, 2016, Plaintiff asked his supervisor for a letter of recommendation to work an overtime detail for the "High Intensity Community-Oriented Policing" program. (Jones Deposition at 88-89). His

supervisor refused to submit a recommendation letter, but provided no reason for the refusal. (*Id.* at 90-91). In April 2016, Plaintiff received a right-to-sue letter from the EEOC regarding his July 2015 EEOC charge. (Doc. # 1-2). In July 2016, Plaintiff filed this lawsuit. (Doc. # 1).

## III.    Standard of Review for Summary Judgment Motion

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## IV.    Analysis

After careful review, the court concludes that Defendant's motion is due to be granted in part and denied in part.  Plaintiff's race discrimination claims are due to be dismissed but his retaliation claims must be resolved by a trier-of-fact.

### A.    Plaintiff Has Failed to Present a *Prima Face* Case of Race Discrimination for the Four Discrimination Claims in His Complaint

In Counts One through Four of the Complaint, Plaintiff claims that Defendant committed actionable race discrimination on four occasions: (1) on March 2, 2015, when Quigley-Vining confronted him and created a hostile work environment; (2) on June 27, 2015, when Quigley-Vining yelled at him in front of coworkers and threatened him with discipline; (3) on June 29, 2015, when Quigley-Vining issued him a counseling letter; and (4) on July 7, 2015, when Roper reprimanded him.  (Doc. # 1 at ¶¶ 47-58).  Defendant argues that these race discrimination claims fail because (1) none of the four incidents are an "adverse employment action", and (2) Plaintiff has not identified a comparator treated more favorably.  (Doc. # 17 at 12-16).  The court considers each element, in turn.

Typically, Title VII discrimination claims that rely on circumstantial evidence are evaluated under the *McDonnell Douglas* burden-shifting framework.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  "A plaintiff may establish a prima facie case of discrimination through circumstantial evidence by proving that (1) she belongs to a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job."  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004).  Once the plaintiff successfully demonstrates a *prima facie* case, the defendant is required to articulate a legitimate, non-discriminatory reason for its conduct.  *Id.* at 1087.  "If the employer satisfies its burden by

articulating one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." *Id.* Here, Defendant has not offered a legitimate, non-discriminatory reason for the incidents at issue, so the discrimination claims turn on whether Plaintiff has presented sufficient evidence to support a *prima facie* case of discrimination.

In Title VII discrimination claims, an "adverse employment action" must be "a *serious and material* change in the terms, conditions, or privileges of employment." *Crawford v. Carroll*, 529 F.3d 961, 970-71 (11th Cir. 2008) (emphasis in original) (quoting *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001)). Ultimate employment decisions, such as termination, demotion, and failure to hire, are adverse employment actions. *Id.* at 970. If a plaintiff relies on employment actions less severe than an ultimate employment decision to support a discrimination claim, he or she must show that the action substantially altered his or her "compensation, terms, conditions, or privileges of employment, deprive[d] him or her of employment opportunities, or adversely affect[ed] his or her status as an employee." *Id.* (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000)). The court assesses whether an employment action is materially adverse by deciding whether a reasonable person would have found it materially adverse; a plaintiff's subjective opinion about the employment action does not control the assessment. *Davis*, 245 F.3d at 1239, *abrogated in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (clarifying the type of adverse action necessary to support a retaliation claim).

To succeed on the third prong of the *prima facie* case, Plaintiff must produce evidence that Defendant treated similarly situated employees outside of his protected class more favorably

than him. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997), *abrogated on other grounds by Burlington*, 548 U.S. 53. In the work rules/discipline context, the Eleventh Circuit has adopted a test which requires a plaintiff to show that his "comparator" is "similarly situated to the plaintiff in all relevant respects" and that the "quantity and quality of the comparator's misconduct must be nearly identical." *Stone & Webster Constr., Inc. v. U.S. Dep't of Labor*, 684 F.3d 1127, 1135 (11th Cir. 2012) (citations omitted). "We ask whether the comparator is involved in the same or similar conduct as the plaintiff yet disciplined in a different way." *Id.* That is, "[t]he comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Wilson*, 376 F.3d at 1091. The relevant inquiry in an employment-discrimination action involving discipline is whether the employer subjected the employees to different work policies. *See Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999).

In *Davis*, the Eleventh Circuit analyzed a race discrimination claim based on negative job evaluations. 245 F.3d at 1240-43. There, the plaintiff -- a police officer -- claimed that a counseling memorandum and a job performance memorandum from his superiors constituted adverse employment actions. *Id.* at 1240. Neither evaluation led to a loss of pay, a loss of benefits, nor a negative annual performance evaluation. *Id.* The plaintiff argued that the evaluations qualified as adverse employment actions because they would remain in his personnel file and could hinder his ability to obtain a better employment position in the future. *Id.* at 1241. To the contrary, the Eleventh Circuit concluded that the memoranda were not adverse employment actions because the plaintiff could not show tangible consequences that he suffered from their issuance. *Id.* at 1243. The *Davis* opinion recognized that several courts have found that "criticisms of an employee's job performance—written or oral—that do not lead to tangible

job consequences will rarely form a permissible predicate for a Title VII suit." *Id.* at 1241. It explained that performance criticisms are "an ordinary and appropriate feature of the workplace," and expressed concern that extending Title VII liability to such "day-to-day critiques" could squelch communication between supervisors and subordinates. *Id.* at 1242. Accordingly, the Eleventh Circuit concluded, "A negative evaluation that otherwise would not be actionable will rarely, if ever, become actionable merely because the employee comes forward with evidence that his future prospects have been or will be hindered as a result." *Id.* at 1243.

Here, Plaintiff has failed to present a *prima facie* case of race discrimination that violates Title VII for two reasons. *First*, none of the four employment actions described in Counts One through Four of the Complaint constitute an adverse employment action. All of these employment actions fall within the scope of criticism by a supervisor to a subordinate, even though Quigley-Vining was not Plaintiff's direct supervisor. As in *Davis*, Plaintiff does not argue -- and the Rule 56 evidence does not show -- that Plaintiff suffered any loss of pay, loss of benefits, or negative impact on an annual evaluation from the verbal counseling, verbal and written warnings, and written reprimand. (*See* Doc. # 19 at 5). *See also Davis*, 245 F.3d at 1240. Because the employment actions described in Counts One, Two, Three, and Four of the Complaint are analogous to the job performance criticisms at issue in *Davis*, Plaintiff has failed to show that they constitute adverse employment actions.

In his opposition brief, Plaintiff argues that he suffered adverse employment actions when he was reassigned to the patrol division and denied overtime. (Doc. # 19 at 5). To be sure, those employment actions are distinguishable from the ones analyzed in *Davis*. But, Plaintiff's Complaint clearly alleges that the reassignment and denial of overtime constituted unlawful retaliation, not race discrimination. (*See* Doc. # 1 at ¶¶ 59-62) (describing Counts Five,

Six, Seven, and Eight as "Retaliation" counts). Binding Eleventh Circuit precedent forecloses construing an opposition brief as an effective motion to amend the complaint. *Flintlock Constr. Servs., LLC v. Well-Come Holdings, LLC*, 710 F.3d 1221, 1228 (11th Cir. 2013). Therefore, the court cannot consider Plaintiff's newly-asserted argument that Defendant's reassignment of him and its denial of overtime constitute unlawful race discrimination.

*Second*, Plaintiff has not identified a comparator that Defendant treated more favorably than him. Plaintiff argues that Duclos is a comparator because Quigley-Vining did not discipline him for the sexual harassment he committed. (Doc. # 19 at 5). This argument falls flat, though, because, although Quigley-Vining overheard Plaintiff's statements to Duclos, it is undisputed that she did not observe Duclos's previous conduct. (Quigley-Vining Deposition at 25-26). Therefore, Duclos and Plaintiff were not similarly situated when Quigley-Vining verbally reprimanded Plaintiff for his statements. Moreover, to the extent Plaintiff intends to argue that Duclos should have been reprimanded for his misconduct by Roper, he has not shown that Duclos was similarly situated to him because he has not demonstrated that Duclos could have been disciplined under the same work policies Roper applied to him.[6] *See Lathem*, 172 F.3d at 793. Because Plaintiff's race discrimination claims are not premised on materially adverse employment actions, and he has failed to show that Duclos was a similarly situated comparator, Defendant is entitled to summary judgment on all of Plaintiff's race discrimination claims.

---

[6] Plaintiff also has failed to submit his work history or Duclos's work history to the court, so the court cannot determine whether their disciplinary history was similar or whether Duclos's disciplinary history was more substantial than Plaintiff's when Plaintiff received the reprimand. *Cf. Jest v. Archibold Med. Ctr., Inc.*, 561 F. App'x 887, 889 (11th Cir. 2014) (affirming the district court's conclusion that the plaintiff failed to present a similarly situated comparator where her disciplinary history was "far more substantial" than that of the proposed comparators, her misconduct was "more serious", and her misconduct concerned "many more areas of her work").

**B.     Plaintiff's Retaliation Claims May Proceed Because Defendant Has Conceded that Exhaustion is Complete**

In Counts Five through Eight of the Complaint, Plaintiff alleges that Defendant retaliated against him after he filed his first EEOC charge in July 2015. (Doc. # 1 at ¶¶ 59-62). Defendant argues in its summary judgment motion that Plaintiff's retaliation claims should be dismissed because he had not obtained a right-to-sue letter from the EEOC by the time the summary judgment motion was filed. (Doc. # 17 at 16-17).

It is axiomatic that before filing a Title VII action in federal court, a plaintiff first must file an administrative charge with the EEOC and receive a right-to-sue letter from the EEOC. 42 U.S.C. § 2000e-5(f)(1); *Gregory v. Ga. Dep't of Human Resources*, 355 F.3d 1277, 1279 (11th Cir. 2004). A plaintiff's failure to exhaust administrative remedies is a "matter in abatement" and "should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment." *Bryant v. Rich*, 530 F.3d 1368, 1374-75 (11th Cir. 2008) (quoting *Ritza v. Int'l Longshoremen's & Warehousemen's Union*, 837 F.2d 365, 368-69 (9th Cir. 1988)). The plaintiff's federal action is "limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gregory*, 355 F.3d at 1280 (internal quotation marks omitted).

During oral argument, Plaintiff's counsel explained on the record that Plaintiff's second EEOC action was transferred to another EEOC office and terminated while the Motion for Summary Judgment was pending. Plaintiff's counsel was not certain whether Plaintiff received a right-to-sue letter from the EEOC, but Defendant's counsel received notice of the terminated EEOC action. Defendant's counsel conceded on the record that the exhaustion argument is moot because the EEOC has ruled on Plaintiff's second EEOC charge. In light of that concession, the court concludes that Plaintiff has complied with the administrative exhaustion requirements for

the retaliation claims, and proceeds to address Defendant's merits arguments against the claimed retaliation.

### C.    Plaintiff Has Presented a Triable Retaliation Claim

Turning to the merits of Plaintiff's retaliation claims, Defendant argues that Plaintiff cannot establish a *prima facie* case of retaliation for two reasons.  First, Defendant argues that Plaintiff's transfer does not constitute an adverse employment action.  (Doc. # 17 at 18-19). Second, Defendant claims that the relevant decisionmaker was unaware of Plaintiff's protected EEOC charge because Roper was the final decisionmaker for all hiring, transfers, promotions, terminations, and disciplinary actions conducted by the Police Department.   (*Id.* at 19-21). Plaintiff responds that the transfer was an adverse action because it deprived him of opportunities to work overtime and created a hostile work environment, and the transfer was causally connected to his EEOC charge because both actions occurred in close temporal proximity.  (Doc. # 19 at 6-7).

Title VII's anti-retaliation provision provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  To establish a *prima facie* case of retaliation, a plaintiff must show that (1) he engaged in a statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relationship between the two events.  *Holifield*, 115 F.3d at 1566.

Adverse employment actions typically center on ultimate employment decisions, such as termination.  Nevertheless, an employer's actions may also qualify as adverse employment

actions if they reach "some threshold level of substantiality." *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002). In evaluating whether a defendant's actions meet that threshold, the court must determine whether an employer's actions likely would have "dissuaded a reasonable worker from making or supporting a charge" against the employer. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Of course, "the significance of any given act of retaliation will often depend upon the particular circumstances."[7] *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 175 (2011). For example, a scheduling change may be more adverse if the affected employee has young children, and exclusion from a work lunch may be more adverse if the lunch comes with training that could contribute to the employee's career advancement. *Burlington*, 548 U.S. at 69.

A plaintiff establishes a causal connection by showing that the relevant decisionmaker was "aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Shannon*, 292 F.3d at 716 (quoting *Gupta*, 212 F.3d at 590). "Close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated." *Bass v. Bd. of Cty. Comm'rs*, 256 F.3d 1095, 1119 (11th Cir. 2001), *overruled in part on other grounds by Crawford*, 529 F.3d 961. A lapse in time of one month between a protected activity and an adverse action is sufficiently close to support a causal connection between the two. *See Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).

---

[7] A transfer can constitute a materially adverse employment action if the employee is moved from a more prestigious job to a less prestigious one. *See, e.g.*, *Hickey v. Columbus Consol. Gov't*, No. 4:07-CV-96 (CDL), 2011 WL 882110, at *2-3 (M.D. Ga. Mar. 10, 2011) (discussing a materially adverse transfer of a police officer from a vice unit to a burglary and theft unit). Plaintiff has not argued in his opposition brief that the transfer was materially adverse due to a loss of prestige (*see* Doc. # 19 at 6-7), so the court has not considered the relative prestige of the Task Force and the patrol unit positions.

If a plaintiff makes out a *prima facie* case of retaliation, the burden shifts to the employer to articulate a legitimate reason for the adverse employment action. *Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999). If the employer proffers a legitimate reason, the burden shifts back to the employee to show that the legitimate reason was pretext for prohibited retaliatory conduct. *Id.* Defendant has not at this stage provided a legitimate reason for Plaintiff's transfer from the Task Force to a patrol unit or a legitimate reason for denying him overtime opportunities while working for the patrol unit. (Doc. # 17 at 17-21). Therefore, its request for summary judgment rises or falls on whether Plaintiff can establish a *prima facie* case of retaliation.

> ### i.      Plaintiff's August 2015 Transfer Constituted a Materially Adverse Employment Action

Several courts have concluded that a shift change can constitute a materially adverse employment action under *Burlington*. *E.g.*, *Smith v. City of Greensboro*, 647 F. App'x 976, 981-82 (11th Cir. 2016) (concluding that a reasonable jury could find a shift change to be materially adverse when it prevented the plaintiff from holding a second job he needed to support his family); *Prince v. Melwood Nursing Ctr., LLC*, No. 6:16-cv-1103-Orl-37DCI, 2017 WL 6406832, at *8 (M.D. Fla. Dec. 15, 2017) (concluding that the defendant's rejections of plaintiff's applications for a shift change from night shift to day shift could constitute a materially adverse employment action where plaintiff was a mother of five children, she recently had returned from maternity leave, and she considered the possible shift change to be a promotion, given her circumstances); *Johnson v. Fla. Dep't of Corr.*, No. 3:04-CV-522-J-25HTS, 2007 WL 4404209, at *6 (M.D. Fla. Feb. 22, 2007) (finding a jury issue as to whether a transfer was a materially adverse action because of a long commuting distance between assignments and childcare issues created by the different schedule at the newly assigned

position).  Courts also have concluded that the denial of overtime opportunities may constitute an adverse action for purposes of a retaliation claim.  *E.g.*, *Tatroe v. Cobb Cty., Ga.*, No. 1:04-CV-1074-WSD, 2008 WL 361010, at *11 (N.D. Ga. Feb. 8, 2008) ("On reconsideration under the lower *Burlington* standard, the Court determines that the prohibition on working overtime might well have dissuaded a reasonable worker in Plaintiff's position from making protected speech.").

To be sure, following *Burlington*, other courts have found in certain circumstances that shift changes are not materially adverse actions and do not support an employee's retaliation claim.  *E.g.*, *Deprado v. City of Miami*, 264 F. App'x 769, 771-73 (11th Cir. 2008) (concluding that a transfer from a training unit to a patrol unit was not a materially adverse action because the future financial harm to plaintiff could not have been foreseen at the time of transfer, plaintiff lacked evidence that defendant transferred him to a less prestigious position, and plaintiff failed to specify what opportunities he lost); *Worley v. City of Lilburn*, No. 1:06-cv-2654-CAP-RGV, 2009 WL 10668430, at *12-13 (N.D. Ga. June 3, 2009) (concluding that a shift change from day shift to night shift was not a materially adverse action because routine reassignments do not rise to the level of adverse actions where the salary, benefits, and routine duties of each shift are the same, given judicial reluctance to classify reassignments and lateral transfers as adverse actions), *adopted*, 2009 WL 10672381 (N.D. Ga. Sept. 9, 2009), *aff'd on other grounds*, 408 F. App'x 248 (11th Cir. 2011); *Avery v. Ala. State Univ.*, No. 2:15-CV-239-WHA, 2016 WL 7238942, at *10 (M.D. Ala. Dec. 13, 2016) (determining that a police officer's shift change was not a materially adverse action because the shunning and ostracism against her was insufficient to classify the transfer as adverse, plaintiff admitted to being satisfied with the schedule change, and plaintiff requested the training officer she worked under after the schedule change).  In this case, though, the court finds there is substantial evidence that the shift change was noticeably adverse to

Plaintiff because the Police Department moved him from a day shift to an overnight shift, and the change of shifts prevented him from seeking out certain overtime opportunities that he could take advantage of while working on the day shift.

Practically speaking, many employees do not prefer night work and may be dissuaded from making protected discrimination complaints if they are aware that they will be moved from day work to night work. *See Tatroe*, 2008 WL 361010, at *12 (concluding that a shift change from day shift to night shift could support a *prima facie* retaliation claim following *Burlington*). Plaintiff suffered a more severe adverse action than an employee simply moved from day shift to night shift because the change in shifts possibly foreclosed his access to overtime work.[8]  *See Tatroe*, 2008 WL 361010, at *11. Therefore, the court finds material questions of fact as to whether Plaintiff's reassignment from the Task Force to the patrol unit constituted a materially adverse employment action under *Burlington*.

> ii.     **The Rule 56 Record Contains Sufficient Evidence of a Causal Connection Between Plaintiff's EEOC Charge and His Transfer**

The Rule 56 record here presents a genuine factual dispute as to whether the actual decisionmaker knew of Plaintiff's EEOC charge and whether the EEOC charge was related to the transfer decision. First, less than a month elapsed between Plaintiff's filing of the charge and his transfer. (Docs. # 17-1 at 47-48; 17-4 at 1). Second, Walker queried Plaintiff about the EEOC charge approximately one week before the transfer occurred. (Jones Deposition at 56-58). Third, Acton told Plaintiff on the date of the transfer that it had occurred because Walker did not want him on the Task Force, and Acton also asked Plaintiff about his EEOC charge. (*Id.*

---

[8]  The Rule 56 record also contains evidence that Police Department employees closed off Plaintiff's access to overtime shifts in retaliation for his EEOC charge. If Plaintiff lost access to overtime shifts in retaliation for his filing of an EEOC complaint, and he would not have lost access to the shifts otherwise after his shift transfer, that conduct is sufficiently adverse to support a *prima facie* retaliation claim. *Tatroe*, 2008 WL 361010, at *11.

at 63-64). From this evidence, a reasonable juror could find that the actual decisionmaker knew of Plaintiff's EEOC charge, and that a causal connection existed between the charge and the transfer. Defendant's argument that Roper acted as the final decisionmaker for the transfer cuts no ice. Defendant argues that Roper has final authority over personnel decisions (Doc. # 17 at 19-20), but Roper has not averred that he approves all transfers within the Police Department. (*See* Doc. # 17-5 at 2) (averring that Roper approved hiring, transfers, promotions, demotions, terminations, and disciplinary actions, but not stating whether Roper approved all such personnel actions). Nor has Roper averred that he personally approved Plaintiff's transfer to a patrol unit in August 2015. (*See generally* Doc. # 17-5). Therefore, there is disputed Rule 56 evidence as to whether Roper was the relevant decisionmaker.[9]

## V. Conclusion

For the reasons explained above, Defendant's Motion for Summary Judgment (Doc. # 17) is due to be granted in part and denied in part. Defendant is entitled to summary judgment on Plaintiff's race discrimination claims, but is not entitled to summary judgment on Plaintiff's retaliation claims. Defendant's Motion to Strike (Doc. # 20) is due to be denied as moot because the court has disregarded the challenged exhibits, which mainly contain duplicative evidence, in

---

[9] Defendant also argues that the Police Department transferred Plaintiff to a patrol division because Plaintiff complained about retaliation and threatened to submit an EEOC charge against Walker when Walker wrote him up, and Walker informed his supervisor about Plaintiff's threat. (Doc. # 17 at 20) (citing Doc. # 17-3 at 47-48). If Walker's testimony is taken to be true, then the issue would be whether Defendant retaliated against Plaintiff for protected opposition conduct, rather than his participation in the EEOC process initiated by his July 2015 charge. But, Walker's account of the true reason for the transfer is not an undisputed fact (and, the court notes, Defendant did not include that account in its statement of undisputed facts). (*See* Doc. # 17 at 3-7). Therefore, the court cannot rely on it to disregard the genuine factual issue created by the temporal relation between the charge and the transfer and Plaintiff's testimony about queries he received regarding the charge.

Plaintiff raises one retaliation claim for overtime denied to him in January 2016, several months after he filed the first EEOC charge. It is questionable whether Plaintiff can show a causal connection between his first EEOC charge and this alleged denial of overtime, given the lack of temporal proximity between the events and the different decisionmaker involved in that alleged denial, but Defendant has not specifically contested the retaliation claim in Count Eight of the Complaint on this ground. Therefore, the court need not decide this issue at this time.

deciding whether Defendant is entitled to summary judgment.  An Order consistent with this Memorandum Opinion will be entered.

       **DONE** and **ORDERED** this June 7, 2018.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE